Thank you, and good morning, and may I reserve five minutes for rebuttal? Well, you keep track of your own time. Okay. I'm naturally here to ask this Court to reverse the trial court's findings, both as to the reasonableness of the continued attention of Mr. Bueno-Martinez, that is to find that there was clear error in the trial court's conclusion that it was reasonable, but really to point this argument to the inherent unreasonableness to conclude that there was a valid consent given in this case, considering all of the facts known to the police and also known to the trial court, especially at the time that this decision was made. I'd ask the Court to consider that, in fact, Hill v. California Controls here, this is obviously a mistaken identity case. I think it was established at the suppression hearing that the real target of the investigation was not in the car that was stopped by the local police and FBI on the day that Mr. Bueno-Martinez was eventually arrested. They were after his brother, and the brothers may look similar. This year the client was carrying his own ID, but the police might have thought, in fact, say they thought that he might have been his brother anyway carrying the wrong ID. They were unsure there at the beginning as to whether they had the right guy. It turns out they had the wrong guy they didn't want, but it took them a while to sort that out. As I thought about this, I just tried to naturally put myself in the Court's position thinking, what is reasonable here? The police are investigating, as Ms. Van Marder says, a family that had been investigated for a relatively large drug distribution conspiracy. However, the target of the investigation at that point, apparently there was no sufficient evidence to even link him to the home there that Mr. Bueno-Martinez was later walking from. There was some evidence, in addition to what the police already knew about Bueno-Martinez's family and the drug trafficking organization that it apparently belonged to, that a person left the house, sort of like in Delgadillo, where they left the house, they look suspicious, the hood is raised over the person, he's talking on his cell phone, and then Mr. Bueno-Martinez apparently comes out with a couple of bags, puts them in the car and leaves at 6.50 in the morning. Those are facts naturally against us in our position on this case until other facts are considered. It's 6.50 a.m., and according to the suppression hearing testimony, it's dark out. It could have been Mr. Bueno-Martinez, excuse me, her man, Bueno-Martinez. But that proves the point that the police officers had reason to investigate to determine if the person they were following was in fact the person they intended to follow. I think that's correct, and so as I prepared for this, I thought it just seems reasonable that under those circumstances  the police don't have to turn their head to what may be ongoing crime, and they pull them over. And what do they find out at that point? They find a number of facts out, Your Honor, that are important to the second part of our argument, but most importantly at this time to the first part of our argument, that the identification apparently is genuine, that the police naturally have an ability to confirm the validity of the identification. Yes, but here's the problem with this argument. It may be that the identification is genuine. It turns out it was. Yes. It may be that the car registration is genuine. It turns out it was. But it may very well be that this is the brother driving his brother's car, using his brother's identification. Of course. And that seems to me at least a plausible suspicion on the part of the police. It's plausible, but it seems then that if that were the rule on every case, Your Honor, that every Terry stop could in fact be justified for an indefinite duration because the police could quite reasonably challenge their own investigation. Gee, I understand that DOL has determined that this was a probably valid ID, but in fact it may not be valid. But it was under the unique circumstances of this case. That wouldn't necessarily apply to every case, but because it was a family situation and the brothers looked similar and the names were similar, it induced more skepticism in the police than would normally arise. But does it? Because if we consider the additional facts that were found there at the scene of the stop and later arrest, what other facts do we have? One is that apparently there's a 10-year difference in these people. Now, how many of us get the pleasure of learning as we're walking down the street that people think that we're 10 years younger than we are? Certainly not very many. Lots of people do. Well, some people do. Some people do. Especially those that have been under the knife. You just never know. But we can keep explaining away certain facts that are developing, but at some point that police have to conclude that, wait a minute, we really may have the wrong guy. And if I understand that the suspect they were after is 10 years older than that, right? That's what I understood from the record. Yeah, yeah. I mean, I saw the tape. If I had to guess at what his age was before I knew, I mean, I looked at the tape before I knew how old he was, and I thought he was in his 40s. Okay. But what other facts do we know at this point from the video and from the testimony at the suppression hearing? We know that Officer Chavez, who has experience with this defendant, he does. Apparently he's had three stops with him in the past. He opines this is the same ID. It is true. It could have been the same invalid false ID. Counsel, the problem with your approach is that the Supreme Court has cautioned us against dissecting the facts and parsing them. We're supposed to look at it in a totality. So, you know, taking each fact and trying to undermine, you know, the strength of that fact doesn't really help your analysis because the Supreme Court has cautioned us against that very thing. Well, the Supreme Court in Hillview, California, I think, explains that there's a reasonableness standard here. Looking at the totality of the circumstances. Right. And so we have an experienced police officer that has experience with Mr. Bueno-Martinez, and apparently he's opining, wait a minute, this is the same identification this person has used in the past. You had three minutes, so you might want to go to your other argument. I'm definitely going to do that. But, see, these are the facts that are learned at this point, Your Honor, that in fact would lead the court to conclude that this was an invalid consent given because the important facts that are learned here from Officer Chavez are what were not apparently considered by the trial court, is that Mr. Bueno-Martinez spoke English kind of or sort of, and he spoke it brokenly. And as I know that I have about 90 seconds left, I'm going to conclude my remarks at that point, save it for rebuttal, but that then, if this trial court order was sustained, would be the new standard in the Ninth Circuit. It does not appear to be that that should be or is the standard at this time. Thank you. You weren't going to discuss the voluntariness of the consent? You weren't going to discuss the voluntariness of the consent? I am, on the rebuttal. On rebuttal, okay. You're in trouble if the State doesn't address it. Good morning. May it please the Court, I'm going to start off directly addressing what counsel has characterized as a misidentification. This Terry stop, as the district court found, was not just based on misidentification. There was four days of evidence presented during the course of this suppression hearing, and a majority of that had to do with other objective facts that supported the reasonable articulable suspicion,  And as the district court found on pages 688 to 690, and 694 and 696 of the record, those objective facts included the background investigation associated with that residence, the family inclusive of a brother who had been identified as involved in the drug trafficking business, aside from the authorization to conduct a probable cause arrest of Germán Martinez Bueno. So it wasn't just attached to the person, it was attached to the location, which is why they were still sitting on surveillance that morning. And when the rest of the search warrants were executed, the counter surveillance activities and the movements that occurred at that residence that morning was more than enough to support the Terry stop. And what's important when we talk about unreasonable delay, it's 11 to 12 minutes is all it took for those officers to stop the vehicle, to contact the defendant who was not handcuffed, was not placed under arrest, was not touched by one law enforcement officer, a cordial encounter in order first to determine if it was Germán Martinez Bueno, whom they had a probable cause authorization to arrest, to determine if the identification was authentic, to determine if it could in fact be a brother or another family member, to investigate the fact that as the district court found that he hastily put two duffel bags into that vehicle right after the execution of the other search warrants, all of that was being looked into and that 11 to 12 minutes was more than a reasonable amount of time for officers to investigate that suspicion. And this is very distinguishable from the Delgado case. You mean less than a reasonable amount of time. I'm sorry, Your Honor. You mean less than a reasonable amount of time because it was more than a reasonable amount of time they're in trouble when they get to minute 11. I apologize, Your Honor. That 11 to 12 minutes is actually, I would consider that to be a very quick time to try and investigate what all was going on. And it's very different than the Delgado case because in that case, the standard was a probable cause review. They had already arrested the individual. My problem with the case is the voluntariness of the consent. Chavez says he speaks English, kind of. I listened to the tape and I can't really hear the defendant speaking. There's a little muttering, but I can't hear it distinctly. I do hear Officer Leahy asking him where he's headed, and he responds obviously like a, what? Because I hear Officer Leahy then repeating the question with different words. It sounds as though, or it appears from what I see there, that he's not particularly good at English. And I couple that with the extreme improbability of a man with a lot of contraband in the car, not hidden in some interior panel, but just right there. I mean, all you've got to do is open up the duffel bag. There's going to be signing this form. I mean, how have we complied with Garabay that requires a painstaking explanation of the consequences of what he's about to sign? Well, I think, Your Honor, the court actually considered and was concerned about Garabay and it's mentioned in the district court's written. Oh, yeah, the court was concerned. I understand that. And I think that there's a few different responses to the court's inquiry. And what was actually ironic and interesting is the officers involved did not know they were being audio or video recorded. And each of them, the ones that testified, who observed the interaction outside of the videotape, observed the defendant interact with Agent Leahy, observed no body language whatsoever indicative of non-understanding. No questioning. What they observed and didn't observe, I was troubled by a little piece of Officer Leahy's testimony. He was asked was there any indication that he couldn't understand English. Leahy says no. But it was Leahy who said, where are you headed? And then got the question back, basically, I don't understand what you just asked me. And then Leahy asked the question again. So Leahy himself had to repeat a question that the defendant didn't answer or didn't understand. I mean, any normal sort of native English speaker would have understood perfectly what Leahy said. So Leahy himself says incorrectly that he had no indication. Your Honor, I don't think that Agent Leahy was being incorrect in his assessment of his interaction with the defendant. I think that what Agent Leahy's testimony was is that when he was talking to him, that he would ask questions of Agent Leahy, and Agent Leahy would respond. And what was interesting, even the defense-owned expert indicated that a mere ability to ask a question during the conversation back and forth shows a high degree of understanding. I don't think that it's required that there be an establishment that he was fluent in English. I think what is required is that he understood. Let me read to you from SCR 486. This is a question to Leahy. I'm on line 20. SCR 486. Are you with me? Yes. Question. And so all of his responses to you were in English without any hesitation, as if he didn't understand what was going on. That's correct. That's wrong. Now maybe Leahy forgot, but it's very clear from the tape that there was one question as to which he hesitated and indeed said, I have to infer because Leahy was forced to repeat the question, I don't understand. So Leahy was mistaken. I'm not saying he's lying, but he's mistaken. But I think that the most important question that the district court focused on, and I'd have to go back over the rest of that testimony, was during the process of asking if he would like to consent to search. The defendant asked, do I have to? And agently he said, no. And that's the testimony of Agent Rogers, correct? And also with the court, you could hear it on the tape. There was lots of back and forth. I could not hear it on the tape. Could you? There was times when we paused and the volume increased and it went back and forth, and that's why we added the testimony of Alice Rogers. And agently he also testified about that colloquy. And what was also interesting is at the end of the tape, the officers who were standing in the back came forward and they were discussing, I can't believe that he consented to search, and one of them said, you told him he didn't have to, which the court found very credible and authentic because none of them knew that they were being recorded. The question is not whether Leahy said you told him he didn't have to. The question is whether he understood. And I think that in the totality of the circumstances, in the totality of the interaction, I understand the court's concern about the one question, but the totality of the interaction with the defendant, as well as the presence of Officer Chavez, whom he had had contact with, whom he knew who could speak Spanish, all of the totality of those facts pointed to the district court, which I believe correctly found that he did understand the consent. Counsel, does the record reflect that when the question was repeated it was because he didn't understand it or because he didn't hear it? Do we know which of those two alternatives? Which question are you referring to, Your Honor? The question that Officer Leahy had to repeat. Does the record reflect that the question had to be repeated because he didn't understand it or because he didn't hear it, or do we know? Your Honor, I don't. I have to go back through that particular part of the record. My memory is that there was never any testimony that he didn't understand, that Alice Rogers testified that there was never any indication the defendant didn't understand the interaction, and the same with Agent Leahy, as well as the impression from the videotape, that there was never testimony that the defendant didn't understand the questions being asked of him, that the testimony was that the defendant was able to interact. Can I ask you a question? We're running out of time. Yes. From Amano, which is in a case involving a foreign national, one of the things they have to do is whether the advice of rights was in the defense, whether the defendant appeared to understand those rights. Now, somewhere else it says that you have to have a painstaking explanation of determine whether the defendant appeared to understand those rights. What evidence is there that there was a painstaking explanation and that the defendant understood what his rights were? Your Honor, I think as the district court found in this particular case, the defendant was not placed under arrest. The defendant was not being interrogated pursuant to or after arrest or after the advisement of Miranda. And the district court properly distinguished the Gariby case. And in these particular circumstances, the defendant, because the defendant was not under arrest, had not been placed under arrest, that this was a non-coercive encounter, as the district court found, that in the totality of the circumstances before it, the consent to search form, that under those circumstances, that same analysis did not apply. But that does not speak to the question Judge Reinhart asked. He asked, what's in the record to let us know that there was a painstaking explanation of his rights, including the right not to sign the form? Well, what's in the record, Your Honor, regarding the consent, is that of the five factors that the court has to consider is, number one, he was not in custody. Number two, there was no guns drawn. He was advised that he did not have to consent, and that is that second question that I referred to earlier, where the defendant inquired of Agent Leahy, do I have to consent? In English, he asked that question, and Agent Leahy said no, and that was confirmed and testified to by the other agent present who observed the interaction, as well as Officer Chavez. So he was advised that he did not have to consent to the search. He was not advised of Miranda, because at that time, he was not placed under arrest. Thank you. And so, Your Honors, in ---- No, that's your minute over. Oh, I'm a minute. I apologize, Your Honor. Thank you very much. Thank you. Thank you. We agree with what Ms. Van Marder says, that in considering, the court should consider the totality of the circumstances here, but when the court does that, it has to consider other circumstances, I believe. One, of course, is that there's all sorts of circumstantial evidence here that Mr. Bueno-Martinez did not understand. Every time he asks a question of clarification, who does he ask? He asks Officer Chavez. Officer Chavez has had contact with him. Bueno-Martinez has had contact with him. When does he ask for any clarification from Chavez? He seems to ask Officer Chavez questions a number of times, always in Spanish. Yeah. And every single time he's asked a question ---- Do you have a translation of those questions and those answers? I listen to them, and I don't speak Spanish, so I have no idea what was said. No, I don't. I don't speak either, and I did not get it translated. You see, he's demonstrating his, first of all, his desire to understand what is going on, and Officer Chavez each and every time tells him, I cannot tell you, you have to talk to Agent Leahy. How do you know that's what he says? I think that is what he says. And then the question ---- In what language? In Spanish. In Spanish. And so then the question ---- I thought you didn't understand that. He doesn't really say that he doesn't understand, but he's asking questions of Chavez, and Chavez just simply says, sorry, I don't know the answers to it. And then he turns and asks these questions in kind of English, and brokenly English, according to Officer Chavez. Well, Officer Chavez at SCR 216 was asked about whether or not he saw him talking to Leahy, and whether there was anything about the contact that led him to believe he didn't understand English. And Officer Chavez said there was nothing about the interchange between Officer Leahy and your client that made him think he had difficulty speaking English. So why was it clear error for the district court to credit that testimony? Because it's taking that answer out of context. That was one of his answers. But a clearer answer is brokenly. A clearer answer, Your Honor, is kind of. But if there are two views of the evidence and the district court adopts one, it cannot be clear error. If the district court adopts one interpretation of the evidence as opposed to another interpretation of the evidence, how can that be clear error? Because when it considers the totality, for example, the expert witness, it is true what Ms. Van Marder says, that one of Mr. Buena-Martinez's responses could demonstrate, in fact, a high understanding of English. In fact, that never changed her conclusion. And so we know that Judge Nielsen considered her testimony, apparently found it credible, because he's concluded that that is an important fact that was only testified to by her. But we also know that she never, never, ever changed her conclusion that Mr. Buena-Martinez was speaking at a first-grade level, which really brings me to the conclusions of my remarks. Is that the standard of this circuit? I think not. That first-grade level is sufficient to understand. You know, I had trouble with understanding what the language expert meant by first-grade level. I mean, I'm quite accustomed to people talking about people who are mentally retarded. You know, he has an intellectual capacity of a first-grader, et cetera. But speaking at a first-grade level for someone who's fully fluent in his own native language, first-grade doesn't translate very well. It's an odd way of expressing how well he does or does not understand or express himself in the language. It is so. And I'd have to agree with that. But then we consider the other more. And I really, when I hear lay people talk, they can so many times clear up what educated people, how educated people speak. And it was so, not that Officer Chavez is not educated, but what could be clearer than brokenly? What could be clearer? Did he say brokenly or just kind of? Brokenly. I thought he said kind of. Well, he said both. He said kind of speaks English. What could be clearer than somebody who can kind of speak English? It's clear to him, apparently, that Mr. Bruno Martinez probably did not understand that. I end up having the problem that Judge Rawlinson alluded to. I've got a finding of fact by the district judge, having listened to the testimony of the officers, that he understood English well enough to know what he was doing. And I'm having trouble getting around that factual finding. Could the court restate that, please? I'm having trouble getting around the factual finding by the district court that your client understood well enough. The court, I'm just reading from Judge Nielsen's order, the court has concluded as well that the defendant understood the consent discussion. Officer Leahy testified that that's a factual finding and there's sufficient testimony in the record to support that factual finding. I might or might not come to that conclusion were I sitting as a district judge. And it seems that there's direction here from this court's previous opinions and the U.S. Supreme Court's opinion in Illinois v. Gates. And they say these incentives that encourage the warrant process are undermined by resolution of close cases in favor of law enforcement. And it's our position, of course, that this is less than a close case and that, in fact, the district court's denial of the original search warrant application to search the house is another very clear circumstance, in fact, that the police knew that this is a problem and we'd ask that this court overrule the district court's finding. Thank you, counsel. Thank you. Case just argued will be submitted.
judges: Reinhardt, Fletcher W. , Rawlinson